NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE SCHERING-PLOUGH/MERCK MERGER LITIGATION | : : : : : : : : : : | **Hon. Dennis M. Cavanaugh**<br><br>**OPINION**<br><br>Civil Action No. 09-CV-1099 (DMC) |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Plaintiffs for final approval of class certification, final approval of the proposed Settlement and for an award of attorneys' fees consistent with the provision set forth in the Stipulation of Settlement. After considering the submissions of the parties, and based upon the fairness hearing conducted before this Court on March 24, 2010, it is the decision of this Court for the reasons herein expressed, Plaintiffs' motion for class certification is **granted**, for final approval of the Settlement is **granted** and for an award of attorneys' fees is **granted**.

I.    **BACKGROUND**[1]

On March 9, 2009, Schering-Plough Corporation ("Schering-Plough") and Merck & Co., Inc.

---

[1]These facts have been adopted from the parties' respective submissions.

("Merck"), announced that their respective boards of directors had unanimously approved an agreement and plan of merger (the "Merger Agreement") under which the two companies would be combined (the "Merger"). Under the terms of the Merger, Schering-Plough, which would continue as the surviving public corporation, would be renamed Merck & Co., Inc. ("New Merck"); Merck would become a wholly-owned subsidiary of New Merck; Schering-Plough shareholders would receive $10.50 in cash and 0.5767 of a share of New Merck common stock for each share of Schering-Plough common stock they hold; and Merck shareholders would receive one share of common stock of New Merck for each share of Merck common stock they hold. The transaction was valued at approximately $41.1 billion.

A.     Procedural History

Actions seeking to block the Merger were filed against Schering-Plough and its board of directors (the "Board") beginning on March 10, 2009, in both the Superior Court of New Jersey, Union County ("Superior Court"), and the United States District Court for the District of New Jersey ("District Court"). In total, 11 cases were filed in the Superior Court. Seven plaintiffs filed actions in the Law Division (*Plotkin*, *Zank*, *Rosenberg*, *Clark*, *Rubery*, *Murphy*, and *Gordone*), while four complaints were filed in the Chancery Division (*Pirelli Armstrong Tire Pension Fund*, *Manson*, *Erste-Sparinvest*, and *City of Dearborne Heights Retirement System*) (collectively, the "State Actions"). An additional four cases were filed in District Court: *Landesbank Berlin Investment*, *Husarsky*, *Louisiana Municipal Employees Retirement System* ("*LAMPERS*"), and *City of Edinburgh/Lothian Pension Fund* (collectively, the "Federal Actions").

On April 30, 2009, the Court entered an Order appointing Carella Byrne and Grant &

2

Eisenhofer as co-lead counsel, with Seeger Weiss as liaison counsel (collectively, "Class Counsel"), in the District Court action and, in a separate Order, consolidated all of the Federal Actions. On June 1, 2009, the Court denied the *Plotkin* plaintiffs' motion to abstain in favor of the Superior Court actions based upon *Colorado River* abstention, and held that it would retain jurisdiction over the now-consolidated Federal Actions. In light of the Court's decision to continue with the Federal Actions, the Chancery Division dismissed the State Actions by way of Order, also dated June 1, 2009.

B.      Post Merger Claims and Facts

The complaints in all of the actions generally alleged that the Schering board members had breached their fiduciary duties to shareholders by approving the Merger, because the terms of the Merger were insufficiently favorable to Schering's shareholders and/or the Board had failed to perform appropriate due diligence before approving the Merger. Throughout the litigation the board members denied any wrongdoing in connection with the Merger.

Three days after the announcement of the Merger, on March 12, 2009, an article appeared in *Lancet*, a prestigious medical journal, reporting on a favorable clinical trial for TRA, a drug which Schering had "in the pipeline" and expected to be a potential blockbuster drug. On the day after the announcement of the publication of the *Lancet* article, Merck's stock jumped 12.4%.

On May 20, 2009, Schering and Merck issued a joint preliminary proxy statement on SEC Form S-4 (the "May S-4") that purported to disclose to shareholders all material aspects of the Merger, including the process that lead up to the Board of Directors' approval.

On June 3, 2009, Class Counsel filed a consolidated complaint (the "Consolidated

Complaint") which generally repeated the allegations contained in the initial complaints and added allegations concerning (a) the timing of the Merger announcement relative to the March 12, 2009 *Lancet* article about TRA;[2]1 (b) alleged incomplete and materially misleading disclosures in the May S-4; and © severance payments to Schering executives.

On June 16, 2009, Schering and Merck filed an amended S-4 (the "June S-4"), which contained additional disclosures from the May S-4. For instance, the June S-4 disclosed the fees to be received by Schering's and Merck's financial advisers, Goldman, Sachs & Co. ("Goldman") and Morgan Stanley & Co., Incorporated ("Morgan Stanley"), including the percentage of their respective fees that was contingent upon consummation of the Merger. Schering also disclosed the existence of the pending arbitration relating to Remicade andgolimumab, which was filed by a subsidiary of Johnson & Johnson ("J&J") with respect to a distribution agreement with a subsidiary of Schering-Plough, giving the Schering subsidiary the right to distribute these products.[3]

### C.       Discovery

Immediately after the Consolidated Complaint was filed, Class Counsel and Defendants'

---

[2]

The Consolidated Complaint alleged that the timing of the announcement was material to the relative value of Merck's offer to Schering shareholders. The Consolidated Complaint alleged that, had the *Lancet* article appeared before the announcement of the Merger, Schering's shareholders, rather than Merck's, would have benefitted from the announcement. Class Counsel's economic experts estimated this would have resulted in a 2.7% discount to Schering shareholders rather than the announced 34% premium.

[3]

The disclosure of this arbitration was material because the Remicade distribution agreement, which was worth more than $2 billion per year to Schering-Plough, provided that it could be terminated by one party if the other party underwent a "change of control." J&J contended that the Merger constituted a "change of control," giving it the right to terminate the distribution agreement. In Merck's 2010 annual report, filed on March 1, 2010, Merck stated that an adverse decision in this arbitration would have a material adverse affect on Merck's business.

counsel agreed upon an accelerated discovery and briefing schedule for a possible preliminary injunction motion to stop the vote on Merger, which was estimated to be held during the first week of August 2009. Defendants agreed to produce documents on a rolling basis, and depositions where scheduled so that an application for a preliminary injunction could be filed and ruled upon by the end of July 2009.

As part of the discovery process, Class Counsel and their experts reviewed more than 180,000 pages of documents, including Board meeting minutes, Goldman and Morgan Stanley presentations and deal evaluations, and internal communications from Schering. In addition, Class Counsel deposed Fred Hassan, Schering's CEO and Chairman, and Patricia Russo, Schering-Plough's lead Independent Director.

The information provided in discovery tended to confirm Schering's representations in the May S-4 that its Board of Directors considered alternative merger partners other than Merck, and negotiated the merger agreement in good faith and at an arm's-length basis. The documentary evidence and depositions also confirmed that Schering's board had not considered the timing of the release of the *Lancet* article relative to the timing of the announcement of the Merger.

D.    Settlement

Throughout the discovery process, Class Counsel and Defendants' counsel discussed potential resolutions of the claims asserted in the Consolidated Complaint. Based upon the information provided in discovery, Class Counsel believed that the best potential result would be a preliminary injunction preventing a vote on the Merger until additional disclosures were made to shareholders. In order to resolve the claims, Defendants agreed to make additional disclosures in

advance of the shareholder vote on the Merger.

On July 24, 2009, Schering-Plough published an SEC Form 8-K (the "8-K") which addressed, among other things, Class Counsel's claims concerning the *Lancet* announcement. Specifically, the 8-K showed shareholders the movement of Merck's stock price subsequent to the *Lancet* announcement, and made the following disclosure:

> Schering-Plough confirms that it did not consider the Lancet article specifically, or the timing of its publication, in connection with the board of directors' decision to approve the transaction with Merck or the timing of such approval or the timing of the announcement of the proposed merger with Merck. Further, Schering-Plough did not request or instruct its financial advisors, Goldman, Sachs & Co. and Morgan Stanley & Co., Incorporated, to consider the fact or timing of the publication of the Lancet article in connection with completion of their work in the rendering of their respective fairness opinions.

Schering also included in the 8-K a table setting forth Schering and Merck's stock prices on the days immediately before and after the announcement of the Merger, a timeline of major disclosures of results in the TRA trials, and provided additional information relating to consideration of other potential suitors and the negotiation of "deal protection" provisions in the Merger agreement. In addition, Schering included a copy of the Consolidated Complaint as an exhibit, Exhibit 99.1, to the 8-K. Defendants continued to deny any wrongdoing, and the 8-K specifically stated that the additional disclosures were not required by any law or regulation.

On August 7, 2009, Schering shareholders voted overwhelmingly to approve the Schering-Plough/Merck Merger, with 99.1% of votes cast in favor of the transaction. The parties moved for preliminary approval of the Settlement on December 2, 2009. On December 4, 2009, this Court entered an order preliminarily approving the Settlement, preliminarily certifying a Settlement Class, and directing that notice of the Settlement be distributed to the Class. In accordance with the terms

of the Preliminary Approval Order, Defendants provided direct mail notice to the Class, in excess of 450,000 Schering shareholders.  As of the deadline for filing objections, March 3, 2010, only five Class members objected to the Settlement, representing a minuscule .00001% of the Class.

## II.   LEGAL STANDARD

### A.   Class Certification

Class certification is subject to the requirements of Federal Rule of Civil Procedure 23, subsections (a) and (b). See Amchem Prod., Inc. v. Windsor, 521 U.S. 621-22 (1997). In determining whether certification is appropriate, this Court may take the Settlement Agreement into consideration. See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 308 (3d Cir. 1998) cert denied, 525 U.S. 1114 (1999).

#### 1.   Fed. R. Civ. P. 23(a)

In accordance with Fed. R. Civ. P. 23(a), class certification is appropriate where a prospective class establishes: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). Amchem, 521 U.S. at 613. "To obtain class certification, plaintiffs must establish all four elements of Rule 23(a) along with one provision of Rule 23(b)." Johnston v. HBO Film Mgmt., 265 F.3d 178, 183 (3d Cir. 2001); see Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d Cir. 1996). "All four Rule 23(a) prerequisites for class certification serve as 'guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the

interests of the class members will be fairly and adequately protected in their absence.'" In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009).

        2.      Fed. R. Civ. P. 23(b)

Pursuant to Fed. R. Civ. P. 23(b), a class action may be maintained if Rule 23(a) is satisfied and if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

B.      Settlement Approval

Federal Rule of Civil Procedure 23(e), provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed. R. Civ. P. 23(e). In determining whether to approve a class action settlement pursuant to Rule 23(e), "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members" In re GM Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 785 (3d Cir.1995) (quoting Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975), cert.

denied, 423 U.S. 864 (1975) (citation omitted)).

Before giving final approval to a proposed class action settlement, the Court must determine that the settlement is "fair, adequate, and reasonable." Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999); Walsh v. Great Atl. & Pac. Tea Co., 726 F.2d 956, 965 (3d Cir.1983). In Girsh v. Jepson, the Third Circuit identified nine factors, so-called "Girsh factors," that a district court should consider when making this determination:

(1)     the complexity, expense and likely duration of the litigation;

(2)     the reaction of the class to the settlement;

(3)     the stage of the proceedings and the amount of discovery completed;

(4)     the risks of establishing liability;

(5)     the risks of establishing damages;

(6)     the risks of maintaining the class action through the trial;

(7)     the ability of the defendants to withstand a greater judgment;

(8)     the range of reasonableness of the settlement fund in light of the best possible recovery;

(9)     the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir.1975). "These factors are a guide and the absence of one or more does not automatically render the settlement unfair." In re American Family Enterprises, 256 B.R. 377, 418 (D.N.J. 2000). Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under Girsh. See In re Orthopedic Bone Screw Prod. Liab. Litig., 176 F.R.D. 158, 184 (E.D. Pa.1997); see also In re AT&T Corp. Sec. Litig., 455 F.3d 160 (3d Cir. 2006).[4]   In sum, the Court's assessment of whether the settlement is fair,

---

[4]

District courts should also consider other relevant and appropriate factors.  The court in Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions), suggested that district courts may consider "the maturity of the underlying substantive issues . . . the extent of discovery on the merits, and other factors that bear on the

adequate and reasonable is guided by the Girsh factors, but the Court is in no way limited to considering only those enumerated factors and is free to consider other relevant circumstances and facts involved in this settlement.

C.      Attorneys' Fees

"While the common benefit doctrine is distinct from the common fund doctrine, the former derives from the latter."  In re Diet Drugs, 582 F.3d 524, 546 n.44 (3d Cir. 2009); see Polonski v. Trump Taj Mahal Assocs., 137 F.3d 139, 145 (3d Cir. 1999) ("The origins of [the common benefit] doctrine can be traced to the common fund rule whereby those who share in a fund must participate in paying attorney's fees when a prevailing plaintiff's litigation redounds to the benefit of the common fund."). With respect to the common benefit doctrine, "[t]he creation or preservation of a fund is not the justification for the fee award; rather, [ ] it is the vindication of the class' [ ]rights that is the common benefit conferred on the class that justifies an award of attorneys' fees." Pawlak v. Greenawalt, 713 F.3d 972, 983 (3d Cir. 1983).  "[A] common benefit action is distinguishable from a common fund action because any fees not awarded to counsel will not be paid to the plaintiffs to augment their settlement fund, as is the case in the normal common fund situation." Id.

"Under the common benefit doctrine, an award of attorney's fees is appropriate where 'the plaintiff's successful litigation confers a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.'" In re Diet Drugs, 582 F.3d 524, 546

---

ability to assess the probable outcome of a trial on the merits of liability and individual damages . . . whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable."  148 F.3d 283, 323 (3d Cir. 1998).

(3d Cir. 2009) (quoting Polonski v. Trump Taj Mahal Assocs., 137 F.3d 139, 145 (3d Cir. 1999)).

"This test entails satisfying three distinct elements: (1) the plaintiff must confer a substantial benefit; (2) to members of an ascertainable class; and (3) the court must ensure that the costs are proportionally spread among that class. Because this test may be read literally to include every lawsuit against any institutional defendant, we have refined this language further." Id. "In Marshall v. United Steel Workers, 666 F.2d 845, 848 (3d Cir. 1981), the Third Circuit Court of Appeals inquired: (1) whether the benefits may be traced with some accuracy; (2) whether the class of beneficiaries are readily identifiable; and, (3) whether there is a reasonable basis for confidence that the costs may be shifted with some precision to those benefitting." Id.

## III.   DISCUSSION

### A.   Class Certification

#### 1.   Fed. R. Civ. P. 23(a)

The prospective class proposes that the numerosity requirement is satisfied given that upon certification, the class will consist of thousands of Schering shareholders, collectively owning more than 1.6 billions shares of stock. To date, over 450,000 putative members have been identified and noticed.  "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001), cert. denied, 536 U.S. 958 (2002). The size of the prospective class far exceeds the threshold number of constituents recognized by the Third Circuit Court of Appeals for the United States, therefore, the numerosity requirement is satisfied.

The prospective class contends that the commonality requirement is satisfied given that all

Plaintiffs are united by a common question of fact and/or law. A common question of fact concerns whether disclosures, pertaining to the proposed transaction, provided to shareholders for the purpose of voting upon the Schering/Merck merger were adequate. Further, a common question of law concerns whether the members of the board breached fiduciary duties owed to shareholders in consummating the proposed transaction. "Rule 23(a)(2)'s commonality element requires that the proposed class members share at least one question of fact or law in common with each other." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527-28 (3d Cir. 2004). "Because the [commonality] requirement may be satisfied by a single common issue, it is easily met." Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). Questions of fact and law common to all prospective class members satisfies the commonality requirement for purposes of Fed. R. Civ. P. 23(a).

The prospective class asserts that the typicality requirement is satisfied because "Defendants acted or failed to act in the same manner identically with respect to all shareholders." "Typicality requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" In re Schering Plough Corp., 589 at 597. "Typicality is satisfied so long as the interests of all plaintiffs are "aligned." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531 (3d Cir. 2004). So long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is usually established regardless of factual differences." Newton v. Merrill Lynch Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183-84 (3d Cir. 2001). "[T]he named plaintiffs' claims must merely be 'typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class.'" In re Schering Plough Corp., 589 at 597 (citing Beck v. Maximus, Inc., 457 F.3d 291, 295 (3d Cir. 2006)). "The similarity between

claims or defenses of the representative and those of the class does not have to be perfect." Id. (citing Baby Neal, 43 F.3d at 56). Typicality is present given that the misconduct at issue concerns whether Defendants fulfilled or disregarded obligations and duties to shareholders in consummating the underlying transaction.

Corresponding defenses raised with respect to these claims is also typical of each prospective class member and, there is no indication that a defense unique to the representative Plaintiffs exists. See In re Schering Plough Corp., 589 at 599 ("A common thread running through the various components of typicality--the requirements of similarity of legal claims, factual similarity, and absence of defenses unique to the representative--is the interest in ensuring that the class representative's interests and incentives will be generally aligned with those of the class as a whole.").

First, the proposed class indicates that the adequacy requirement is satisfied because the putative class members have precisely the same interest and incentive to pursue claims with respect to the Merger, are subject to the same burden in establishing claims in the underlying action and rely upon the same factual support, namely the disclosure advanced and consideration afforded to individual shareholders in attempting to prevail. Second, in reference to the adequacy of counsel, the proposed class asserts that the firms involved are nationally reputed in the area of class action litigation and the adequacy of each has been acknowledged before this Court in previous class action matters. "The adequacy of representation inquiry has two components designed to ensure that absentees' interests are fully pursued. First, the interests of the named plaintiffs must be sufficiently aligned with those of the absentees." Georgine v. Amchem Products, 83 F.3d 610, 630 (3d Cir. 1996) (internal citation omitted). "This component includes an inquiry into potential conflicts among

various members of the class because the named plaintiffs' interests cannot align with those of absent class members if the interests of different class members are not themselves in alignment. Second, class counsel must be qualified and must serve the interests of the entire class." Id. There is an identity of interest with respect to prospective class members and any potential absentees, therefore, the first prong of the adequacy requirement is satisfied. The national reputation of the firms involved in the present matter along with this Court's previous favorable recognition of these firms satisfies the second prong of the adequacy requirement[5].

Therefore, certification of the class is appropriate with respect to subsection (a) of Fed. R. Civ. P. 23.

        2.     Fed. R. Civ. P. 23(b)

The prospective class asserts that certification is proper in accordance with Fed. R. Civ. P. 23(b)(1)(A) and Fed. R. Civ. P. 23(b)(2). "Subdivision (b)(1)(A) is used to 'obviate the actual or virtual dilemma which would . . . confront the party opposing the class' if separate lawsuits resulted in 'incompatible standards' for that opposing party." In re Comp. of Managerial Prof'l & Tech. Employees Antitrust Litig., 2006 U.S. Dist. LEXIS 249, *14 (D.N.J. Jan. 5, 2006). "Basically the phrase 'incompatible standards of conduct' is deemed to refer to the situation in which different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." Id. (internal citation omitted). "That section requires that the varying

---

[5]

See In re Merck & Co., Vytorin ERISA Litig., 2010 U.S. Dist. LEXIS 12344 (D.N.J. Feb. 9, 2010); Pro v. Hertz Equip. Rental Corp., 2008 U.S. Dist. LEXIS 100181(D.N.J. Dec. 11, 2008).

adjudications 'would establish incompatible standards of conduct for the party opposing the class.'" In re Merck & Co., 2009 U.S. Dist. LEXIS 10243, *33 (D.N.J. Feb. 10, 2009). In that case, the Court determined that "[t]his language does not require that the varying adjudications would establish incompatible standards as the exclusive or even primary remedy. It only requires that varying adjudications would establish incompatible standards, and Plaintiffs have persuaded this Court that this requirement is met." Id. Notably, "[t]he Federal Rules of Civil Procedure do not give Defendants the option of waiving any requirements of Rule 23." Id.

More specifically, the prospective class alleges that this provision is satisfied because in the event of individual suits, there is significant risk that Schering will be exposed to differing standards of conduct with respect to a group that is owed a duty of uniform treatment pursuant to applicable securities laws and regulations as well as fiduciary obligations. The Court agrees that individual suits will likely result in disparate treatment where uniformity is otherwise required and practicable. Therefore, this Court concludes that the provision set forth in Fed. R. Civ. P. 23(b)(1)(A) is satisfied.

With respect to Fed. R. Civ. P. 23(b)(2), "[a] class action is maintainable [ ] when 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . .'" In re Comp. of Managerial, 2006 U.S. Dist. LEXIS 249, at *18. "Subsection (b)(2) class actions are 'limited to those class actions seeking primarily injunctive or corresponding declaratory relief.'" Id. at 19 (citing Barnes v. American Tobacco Co., 161 F.3d 127, 142 (3d Cir. 1998)). Additionally, "class certification under (b)(2) requires that the proposed class be cohesive." Id. According to the Court of Appeals, "while 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive." Id. (citing

15

Barnes, 161 F.3d at 143). Cohesion is required for two reasons: (1) "unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action[;]" and (2) "'the suit could become unmanageable and little value would be gained in proceeding as a class action . . . if significant individual issues were to arise consistently." Id. (citing Santiago v. City of Philadelphia, 72 F.R.D. 619, 628 (E.D. Pa. 1976)); see Barnes, 161 F.3d at 143.

First, the relief sought pursuant to this Settlement is exclusively injunctive or declaratory. Second, the prospective class is cohesive given that the factual circumstances in the present action are the same with respect to members of the prospective class. See Geraghty v. United States Parole Comm'n, 719 F.2d 1199, 1205-06 (3d Cir. 1983). Indeed, the underlying factual circumstances revolve around Defendants' conduct towards prospective class members, specifically with respect to disclosures advanced and the circumstances surrounding the consummation of the Merger.

B.      Settlement Approval

1.      Complexity, Expense and Likely Duration of Litigation

This factor is concerned with assessing the "probable costs, in both time and money, of continued litigation." In re Cendant Corp. Litig., 264 F.3d 201, 234 (3d Cir. 2001). Significant delay in recovery if this case proceeds to trial favors settlement approval. See, e.g., In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 536 (3d Cir. 2004); Weiss v. Mercedes-Benz of N. Am., Inc., 899 F. Supp. 1297, 1301 (D.N.J. 1995). As asserted by Plaintiffs, this case is a complex, $41 billion dollar reverse merger resulting in the creation of the second largest pharmaceutical company in the world. This suit commenced over a year ago. Although the need for the injunction sought has been extinguished given that the Transaction has been consummated and the Merger has concluded, the

remaining call for declaratory relief is likely to result in a significant delay in time and cause each side to incur significant costs and expend extensive time engaging in continued discovery, expert retention, legal analysis and trial. Therefore, this factor favors settlement approval.

2.     Reaction of Class to Settlement

This factor requires the Court to evaluate whether the number of objectors, in proportion to the total class, indicates that the reaction of the class to the settlement is favorable. The Court also notes that the second Girsh factor is especially critical to its fairness analysis, as the reaction of the class "is perhaps the most significant factor to be weighed in considering its adequacy." Sala v. National R.R. Passenger Corp., 721 F. Supp. 80, 83 (E.D. Pa. 1989); Fanning v. AcroMed Corp. (In re Orthopedic Bone Screw Prods. Liab. Litig.), 176 F.R.D. 158, 185 (E.D. Pa. 1997) (stating that a "relatively low objection rate militates strongly in favor of approval of the settlement" (internal citations omitted)). Further, "silence constitutes tacit consent to the agreement." GM Trucks, 55 F.3d 768, 812 (3d Cir. 1995). While the purported class numbers approximately 450,000 members, only 5 have raised objections to the proposed Settlement.  These objections primarily concern the award of attorneys' fees requested, not the merits of the proposed Settlement, and are recited in detail below.  In the absence of an identifiable or tangible economic benefit to shareholders, objectors dispute the $3.5 million dollar fee application of Class Counsel. The limited objections raised, by comparison to the number of prospective class members affected by the proposed Settlement, weighs in favor of Settlement Approval.

3.     Stage of Proceedings and Amount of Discovery Completed

Pursuant to the third Girsh factor, the Court must consider the "degree of case development that Class Counsel have accomplished prior to Settlement," including the type and amount of

discovery already undertaken. GM Trucks, 55 F.3d at 813; see also Prudential, 148 F.3d at 319. In short, under this factor the Court considers whether the of amount of discovery completed in the case has permitted "counsel [to have] an adequate appreciation of the merits of the case before negotiating." Prudential, 148 F.3d at 319; See also AT&T, 455 F.3d at 167 (noting extent of discovery). The discovery analyzed encompasses both formal and "informal" discovery, including discovery from parallel proceedings, companion cases and even third parties, such as experts or witnesses.

Although Settlement was achieved before Defendants filed an Answer to the Amended Consolidated Complaint, Plaintiffs argue that discovery took place on an accelerated and comprehensive basis. Plaintiffs contend that Class Counsel reviewed in excess of 180,000 pages of documents produced by Defendants', conducted depositions, retained experts and informally acquired other information from defense counsel. Further, Class Counsel reviewed this information with the economic experts retained for purposes of the litigation. Class Counsel asserts that "[b]ased upon this review, Class Counsel gained an adequate appreciation of the merits of the claims asserted and determined that the best result for the shareholder was for Schering to make additional disclosures so that the shareholders would be fully informed of all material information in order to make an intelligent decision as to whether the Merger should be approved." Therefore, this factor favors final Settlement approval.

### 4.    Risks of Establishing Liability

A trial on the merits always entails considerable risk. Weiss, 899 F. Supp. at 1301. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than

settle them." GM Trucks, 55 F.3d at 814. "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.'" In re Safety Components Int'l, 166 F. Supp. 2d 72, 89 (D.N.J. 2001).

"Corporate directors have a fiduciary relationship with the corporation, and its stockholders." Casey v. Brennan, 344 N.J. Super. 83, 108 (App. Div. 2001) (citing Francis v. United Jersey Bank, 87 N.J. 15, 36 (1981)). "New Jersey law has characterized the directors of a corporation as fiduciaries and has demanded of them the utmost fidelity in their dealings with the corporation and its stockholders." Id. (citing Daloisio v. Peninsula Land Co., 43 N.J. Super. 79, 88 (App. Div. 1956)). In analyzing corporate law, New Jersey courts look to Delaware for guidance. Balsamides v. Protameen Chems., 160 N.J. 352, 372-73 (1999). Directors are required to "disclose fully and fairly all material information within the board's control when it seeks shareholder action." Wayne Co. Employees Retirement Sys. v. Corti, 954 A.2d 319, 330 (Del. Ch. 2008). "The fiduciary duties of loyalty, good faith, and due care obligate directors to communicate all material information fully, fairly, and candidly to stockholders." Casey, 344 N.J. Super at 110 (citing Malone v. Brincat, 722 A.2d 5, 9 (Del. 1998)). At the same time, "[a]bsent fraud, self-dealing or unconscionable conduct, the law will not impose liability on corporate fiduciaries, pursuant to the business judgment rule." Fishbein Family Partnership v. PPG Indus., 871 F. Supp. 674, 771 (D.N.J. 1994); see also Maul v. Kirkman, 270 N.J. Super 596 (App. Div. 1994). "The business judgment rule is an acknowledgment of the managerial prerogatives of the directors. It is a presumption that in making a business decision the directors of a corporation acted on an informed basis in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to

establish facts rebutting the presumption." Shields v. Murphy, 1987 U.S. Dist. LEXIS 6992, *13 (D.N.J. Aug. 4, 1987) (citing Aronson v. Lewis, 473 A.2d 805, 812 (1984)).  "The application of the business judgment rule requires a probing into the Defendants' minds to determine whether they acted honestly or in good faith." Resolution Trust Corp. v. Moskowitz, 1994 U.S. Dist. LEXIS 20554, *24 (D.N.J. Aug. 23, 1994) (citing Papalexious v. Tower West Condominium, 167 N.J. Super 516, 527 (Ch. Div. 1979)). "Such a determination, however, involves a complex question of fact [ ]." Id. (citing Papalexious, 167 N.J. Super at 528).

Plaintiffs contend that once "Defendants agreed to provide robust, supplemental disclosures in a final proxy statement, including an express acknowledgment to shareholders that Schering-Plough's Board never considered the *Lancet* article or the timing of its publication in connection with the Merger[,]" a substantial risk arose that Plaintiffs would not be able to establish a breach of fiduciary duty.  The Court agrees that these supplemental disclosures created substantial risk that Plaintiffs would not prevail on a breach of fiduciary duty claim.  Therefore, this element favors Settlement approval.

5.    Risks of Establishing Damages

The fifth Girsh factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." GMC, 55 F.3d at 816. Ultimately, a battle of experts will ensue presenting differing damages calculations and "[a] jury would therefore be faced with competing expert opinions representing very different damage estimates . . . adding further uncertainty." In re Rent-Way Sec. Litig., 305 F. Supp. 2d 491, 506 (W.D. Pa. 2003). Even if liability is successfully established at trial, post-trial motions and appeals present added risk. In re Apollo Group, Inc. Sec. Litig., 2008 U.S. Dist. LEXIS 61995, at *1-4 (D. Ariz. Aug. 4, 2008) (granting Rule 50(b) motion,

following lengthy trial, notwithstanding the $280 million jury verdict).

Given that the articles of incorporation relieve directors of liability of a breach of duty of care and that Plaintiffs did not uncover evidence in support of a claim for breach of duty of loyalty, the only viable claim remaining for purpose of establishing damages was breach of the duty of disclosure. However, traditionally the remedy for a breach of duty of disclosure is injunctive, rather than monetary; therefore, Plaintiffs acknowledge that recovery of damages was unlikely. If the recovery of damages is foreclosed given the nature of the underlying action, the risk of establishing damages is not necessarily present. Therefore, this factor is neutral and does not weigh in favor of or against final Settlement approval.

6.    Ability of Defendants to Maintain Class Certification Through Trial

The standard for certification is the same for settlement classes as it is for conventional classes. GMC, 55 F.3d at 817. Fed. R. Civ. P. 23 also allows for decertification of a class, unmanageable or otherwise. As the Court of Appeals has explained, after *Amchem,* this factor is of negligible importance:

> Because the district court always possesses the authority to decertify or modify a class that proves unmanageable, examination of this factor in the standard class action would appear to be perfunctory. There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement. The test becomes even more 'toothless' after *Amchem.* The Supreme Court in *Amchem* held a district court could take settlement into consideration when deciding whether to certify a class, and that, '[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.' It would seem, therefore, that after *Amchem* the manageability inquiry in settlement-only class actions may not be significant.

Weber v. Gov. Emples. Ins. Co., 2009 U.S. Dist. LEXIS 91322, *35 (D.N.J. Sep. 30, 2009) (citing In re Prudential, 148 F.3d at 321. "To the extent that "[t]here will always be a 'risk' or possibility of

decertification" in any class action, *id.,* this factor weighs marginally in favor of settlement approval."

Id. Plaintiffs do not assert that the ability to maintain a class action poses a significant risk. Therefore, this factor neither weighs against nor in favor of Settlement approval.

7.    Ability of Defendants to Withstand a Greater Judgment

To evaluate whether the Settlement Agreement is fair to Plaintiffs, the Court must evaluate whether Defendants could withstand a judgment much greater than the amount of the settlement. See Cendant, 264 F.3d at 240; Prudential, 148 F.3d at 321-22; GMC, 55 F.3d at 818. Plaintiffs assert that this factor should be considered neutral because once Defendants agreed to provide supplemental disclosures to shareholders, there was nothing left to demand from Defendants.

The Court agrees.  The "capacity to withstand a greater judgment cannot be considered in a vacuum without reference to the value of the settlement and the claims themselves, and in light of the fact that under the settlement the Plaintiffs are eligible to receive the entirety of the benefits to which they believe they were entitled under [the law], this factor does not weigh against approval of the settlement.' Weber, 2009 U.S. Dist. LEXIS 91322, at *37.  As discussed above, the remaining viable claim presented by Plaintiffs primarily allows for injunctive relief.   Among other remedies listed, the Amended Consolidated Complaint requests injunctive relief "requiring Defendants to correct material deficiencies in the Joint Preliminary Proxy before proceeding with any vote of Schering stockholders with respect to the proposed transaction."  Through the collaborative efforts of counsel, this result was achieved and shareholders were provided with more expansive disclosures prior to the consummation of the underlying transaction. Therefore, this factor will be treated as neutral.

8/9.    Reasonableness of the Settlement Fund in Light of the Best Possible Recovery, and in Light of the Attendant Risks of Litigation

"According to Girsh, courts approving settlements should determine a range of reasonable

settlements in light of the best possible recovery (the eighth *Girsh* factor) and a range in light of all the attendant risks of litigation (the ninth factor)." <u>GMC</u>, 55 F.3d at 806.  "The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." <u>In re Warafin</u>, 391 F.3d at 538.  Plaintiffs argue that "Plaintiff[s] achieved the fullest extent of what could [have] been achieved for Company shareholders, and provided a benefit that fully vindicated the rights of Company shareholders." The benefit conferred appears to be the fuller, more complete disclosure of material information surrounding the proposed Merger and memorialized in supplemental disclosures to an amended proxy statement.  Beyond the material information newly disclosed, Plaintiffs assert that Plaintiffs' efforts to compel a more complete disclosure resulted in the extraordinary (and perhaps unprecedented) step of publishing the Amended Consolidated Complaint, and allowed shareholders to independently evaluate additional information concerning the Merger. The value of the benefit conferred is commensurate with the projected success of this case and potential relief available.  Therefore, this factor favors Settlement approval.[6]

### C.    Objections

After providing notice of the Settlement to approximately 450,000 putative class members, five class members filed a response in connection with that notice.  The objections raised primarily concern the fees negotiated at arm's-length pursuant to mediation.[7]

---

[6]

Plaintiffs also assert that the form of notice provided to prospective class members satisfies the requirements of Rule 23(e)(1).  Rule 23(e)(1) instructs courts to "direct notice in a reasonable manner to all class members who would be bound by the proposal." Such notice to class members "need only be reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." <u>Prudential</u>, 962 F. Supp. at 527-28 (citations omitted).

[7]

Submission by George H. Koshefsy ("Mr. Koshefsky") - Mr. Koshefsky submits a request for clarification.  Pursuant to a letter, dated January 14, 2010, Mr. Koshefsky requests clarification as to what this class action and notice of

### 1.  Curtis Karnow ("Mr. Karnow")

Mr. Karnow objects to an award of attorneys' fees on the ground that the alleged benefit received appears trivial, there is no monetary gain on behalf of the putative class and the time spent on the action is allegedly of little value.  Mr. Karnow also seems to suggest that the proposed Settlement is in some way collusive given the arrangement between Plaintiffs and Defendants precludes future claims by prospective class members.

### 2.  Jean F. Goodwyn ("Ms. Goodwyn")

Ms. Goodwyn appears to express her dissatisfaction with what she perceives as Class Counsel's obligation to transmit notice of the proposed Settlement to the proper financial institution, rather than her individually.  Ms. Goodwyn also indicates that she has no time to search through old records and would "love to receive something from this claim, [is] sure it will never happen."

### 3.  Craig W. Cole and Susan G. Cole and as Trustee for the Cole Children's Trust (the "Coles")

The Coles object to the proposed Settlement on the ground that the attorneys' fees requested are  not justified by the work performed and that the lawsuit is a guise for generating legal fees.  That letter requests the "court to carefully examine the validity of the fees being sought and to set aside a portion thereof for the benefit of the shareholders; or in the alternative, to simply reduce the fees (which seem excessive) to a more rational level."

---

proposed Settlement means.

### 4.  Kenneth R. Wynne ("Mr. Wynne")

By way of objection, dated February 12, 2010,. Mr. Wynne contends that "the merger under challenge was consummated after the parties signed a 'Stipulation of Settlement[,]' suggest[ing] that the lawsuit, while pending, was an obstacle to closing the merger."  The objection continues, there is "no indication that the terms of the merger changed in any way based upon the class litigation.  In other words, this facially appears to be an instance in which the litigation was used more to leverage an award of attorneys' fees than it was to achieve any benefit, certainly not an economic benefit, for the stockholders."  Mr. Wynne objects to both the reasonableness of the Settlement and the proposed award of attorneys' fees.

### 5.  Allain Marain ("Mr. Marain")

Mr. Marain objects to the proposed Settlement insofar as the Settlemet: (a) awards attorneys' fees and costs to Class Counsel; (b) bars Defendants from opposing Class Counsel's application for fees and costs; (c) permits Class Counsel to apply for a $3.5 million dollar award of attorneys' fees without notice to the Class and an opportunity to be heard; and (d) places the cost of noticing Class Members of Class Counsel's application for $3.5 million on Defendants.  In accordance with this objection, Mr. Marain asserts that the only purpose of certifying the class and approving the proposed Settlement is to permit an award of attorneys' fees. Mr. Marain alleges that there is no identifiable or economic benefit to the proposed class.  Further, Mr. Marain imputes Class Counsel with a conflict of interest because upon merger, Plaintiffs, the former stockholders of Schering, are now stockholders of Defendant, Merck.  Citing City of Burlington v. Dogue, 505 U.S. 557 (1992), Mr. Marain also contends that the lodestar method, with a multiplier, is inapplicable. Finally, Mr. Marain contends that

25

if fees are awarded, such fees derive from the shareholders' equity in Merck.

In accordance with that objection, Mr. Marain seeks an order to compel Defense Counsel to vigorously oppose Class Counsel's application and to order Class Counsel serve notice on all putative class members affording each a right to be heard.  In lieu of the proposed Settlement, Mr. Marain requests the Court to approve that portion of the Settlement dismissing the lawsuit, to impose sanctions against Class Counsel pursuant to Fed. R. Civ. P. 11, to issue an order compelling defense counsel generally, and Mark R. Silber, Esq., counsel to Class Member Allan Marain ("Mr. Marain"), individually, to submit an affidavit of services and for an entry of joint and several judgment against Class Counsel, awarding reasonable attorneys fees and costs, for a finding of fact that Mr. Marain will save Class Members an amount equal to or in excess of $3.5 million dollars and for such other relief as the Court may deem proper.

Pursuant to the motion for sanctions, Mr. Marain alleges that the initial complaint was unsubstantiated and lacks "evidentiary support."  See Fed. R. Civ. P. 11(b)(3).  In response, Class Counsel contends that pursuant to Fed. R. Civ. P. 11(c)(2), "a motion for sanctions must be made separately from any other motion."  Further, Class Counsel asserts that the motion for sanctions is untimely.  See In re Schaefer Salt Recovery, Inc., 542 F.3d 90 (3d Cir. 2008).  The Court agrees that the motion is untimely.  Nonetheless, even if timing were proper, the Court does not find sanctions proper in the instant matter.

Pursuant to the proceeding conducted on the record before this Court on March 24, 2010, Mr. Marain reasserted the objection to settlement.  The substance of the argument presented seems to be that a common benefit was not conferred, therefore, the fee application attendant to the proposed

Settlement is not warranted.  Instead, Mr. Marain appears to suggest that Class Counsel did not prevail in obtaining the relief requested pursuant to the initial complaint, that the measure of success is dictated by the amount of discovery accomplished rather than achieving actual equitable relief and finally, that counsel's submissions concerning the lodestar projection do not comport the disclosure requirements of the lodestar method.

By way of response, Class Counsel suggests that every class action settlement reflects a measure or judgment as to the strengths and weaknesses of the parties' relative positions regardless of whether the claims are pursued to a final judgment on the merits. Moreover, Class Counsel indicates that Mr. Marain's argument, premised upon the initial complaint, is misguided given that the Amended Consolidated Complaint identifies a Third Count seeking injunctive relief to compel more adequate disclosures which, as evidenced by the supplemental disclosures to the proxy and the SEC 8-K form, was achieved.  Lastly, Class Counsel asserts that the lodestar method in this jurisdiction is used as a cross-check in relation to the fee award negotiated between the parties at arm's-length and agreed upon before a disinterested mediator.  Further, the multiplier suggested, 2.18, is analogous to the multipliers regularly used in common fund cases.

Finally, Defense Counsel indicated that there was an attempt, and indeed a preference, to negotiate the fee issue in the same manner that negotiation of the underlying legal issue was executed. However, when initial fee negotiations proved futile, counsel agreed to submit the issue to mediation. The award requested is the product of successful mediation.

Although few objections were presented to this Court, the objections have been considered and scrutinized.  Ultimately, with the exception of Mr. Marain who contends that a common benefit has

27

not been conferred upon the prospective class, the objections primarily dispute the fee award requested.  As discussed further below, the Court agrees that in the absence of Class Counsel's hard fought negotiation with Defense Counsel, extended disclosures, permitting the shareholders to exercise a fully informed decision pursuant to the Merger that was approved by 99.1%, would not have been rendered; therefore, contrary to Mr. Marain's assertion, a common benefit was rendered and a fee award is appropriate.

        D.     Attorneys' Fees

              1.   <u>Applicability</u>

"Despite the difficulties they pose to measurement, nonpecuniary benefits to the corporation may support a settlement."  <u>Bell Atl. Corp. Bolger</u>, 2 F.3d 1304, 1311 (3d Cir. 1993) (citing <u>Maher v. Zapata Corp.</u>, 714 F.2d 436, 466 (5 Cir. 1983) (nonmonetary relief is adequate settlement relief)). "Attorneys' fees are awardable even though the benefit conferred is purely nonpecuniary in nature." <u>Merola v. Atlantic Richfield Co.</u>, 515 F.2d 165, 169-70 (3d Cir. 1975) (citing <u>Mills</u>, 396 U.S. at 375 (non-monetary recovery on the merits does not preclude an award of fees)).

              i.     Substantial Benefit; Ascertainable Class; and Proportional Spread

"The substantial benefit requirement has been interpreted quite broadly and has been held to include pecuniary as well as nonpecuniary gains." <u>Shields</u>, 1987 U.S. Dist. LEXIS 6992, at *13 (citing <u>Mills</u>, 396 U.S. at 394-96). In <u>Amalgamated Clothing & Textile Workers' Union v. Wal-Mart Stores</u>, the Second Circuit Court of Appeals agreed with the district court's identification of "the facilitation of communication among shareholders and between shareholders and management as a substantial interest that was vindicated by plaintiffs' action."  54 F.3d 69, 72 (2d Cir. 1995) ("In order to exercise

the right of corporate suffrage, shareholders must be informed of important issues confronting the corporation."). "Accordingly, we hold that the promotion of corporate suffrage regarding a significant policy issue confers a substantial benefit regardless of the percentage of votes cast for or against the proposal at issue." Id. at 71-72. "The benefit is similar to the benefit resulting from a successful claim under Rule 14a-9, prohibiting omission of material facts from proxy statements, and fees are regularly allowed for successful 14a-9 lawsuits." Id.; see Mills, 396 U.S. at 396-97; see Palwak, 713 F.2d at 984 (Third Circuit determined that in a common benefit action where the vindication of rights conferred a benefit on the class, a court is permitted to use its equitable powers to award attorneys' fees, including for time spent in preparing a fee application).

Similarly, in the instant matter the supplemental disclosures facilitated communication and informed shareholders of previously undisclosed material information permitting shareholders to exercise their voting rights accordingly. The supplemental disclosures provided to shareholders were material in disclosing the relevance of the *Lancet* article in connection with the Board's consideration of the merger and, the supplemental disclosures were material in apprising shareholders of: (a) fees paid to Schering's financial advisers, including the amount contingent upon consummation of the Merger; (b) the Board's reasons for approaching only one potential Merger partner besides Merck; © details concerning the Board's negotiation of certain aspects of the merger, including "deal-protection" provisions in the Merger Agreement; and (d) information relating to Schering's arbitration efforts to retain marketing rights to its blockbuster drug, Remicade.  Therefore, this Court concludes that a substantial benefit was conferred as a consequence of the efforts of Class Counsel to obtain for shareholders more complete, informative and material supplemental disclosures for the purpose of exercising their vote in accordance with the Merger, ultimately approved by 99.1% of voting shares.

In the instant matter, the ascertainable class consists of the corporation's shareholders. The fees sought amount to $3.5 million dollars. In fact, the Stipulation of Settlement identifies the non-opt out class as consisting of "all holders of Schering-Plough common stock at any time during the period from March 8, 2009 through and including November 3, 2009, the Closing Date of the Transaction, other than the Director Defendants and any person, firm, trust, corporation, or other entity affiliated with any of the Defendants (the "Class")."  Fee division will be spread proportionally given that the cost is incurred by the corporation, an individual fictitious entity, in the first instance.  The debt accrued may indirectly affect the profits ultimately dispensed to shareholders.  To the extent that the debt in some way indirectly encroaches upon the profits payable to shareholders, the affect will be proportionate.

           ii.    Accurate trace; Readily Identifiable Beneficiaries; and Precise Cost Shifting

The benefit conferred may be accurately traced by comparing the original disclosures provided to shareholders with the subsequent proxy statement and attendant supplemental disclosures.  The material information conferred pursuant to the supplemental disclosures is outlined above.  The benefit conferred may also be traced to the ultimate approval of the Merger at a rate of 99.1%.

Pursuant to Fed. R. Civ. P. 23(b), this is a mandatory, non-opt out class.  The readily identifiable beneficiaries consists of the class members as defined in the preceding subsection. Further, given that 99.1% of voting shares voted in favor of the underlying Transaction and that pursuant to the Stipulation of Settlement, Defendants stipulate that "the filing of and prosecution of the claims and discussions with Plaintiffs' counsel were contributing causal factors in Defendants' decision to make the additional disclosures discussed in paragraphs 1 and 2 of Exhibit A and the sole

cause of Defendants' decision to disclose the information set forth in paragraphs 3 through 9 of Exhibit A, which constitutes information sought in Plaintiffs' Consolidated Complaint," the benefitting class members are readily identifiable.[8]

There is a reasonable basis for confidence that the costs may be shifted with some precision to those benefitting.  The holders of common stock contracted with the corporation in purchasing the stock.  In consenting to the Merger by majority vote, common stock shareholders are now subject to the articles of incorporation and by-laws of the new entity.

Therefore, the Court concludes that the common benefit doctrine has been satisfied permitting an appropriate award of attorneys' fees.

2.   Lodestar Method

Pursuant to the lodestar method, "a district court in calculating the attorney fee to be awarded first determines the hours reasonably expended by counsel in successfully achieving the result sought by litigation and then multiplies those hours by a reasonable hourly rate for the attorney's services." Joy Mfg. Corp. v. Pullman-Peabody Co., 742 F. Supp. 911, 913 (W.D. Pa. 1990) (citing Lindy Bros. Builders Inc. of Philadelphia v. American Radiator & Standford Corp., 487 F.2d 161 (3d Cir. 1973)). "The formula also has been applied in the so-called "common benefit" cases where a nonmonetary benefit has been conferred through litigation but no monetary fund exists from which the cost of obtaining the benefit can be spread among the beneficiaries."  Id.; See Tandycrafts, Inc. v. Initio Partners, 562 A.2d 1162, 1167 (Del. 1989). "The Third Circuit's reasoning in *General Motors* illustrates the principle that the method used to calculate an attorney-fee award in a particular case

---

[8]

Exhibit A - Form 8-K submitted to the SEC.

is not necessarily determined by which of the exceptions (i.e., statutory, contractual, or special equity) justified that award. Consequently, attorney fees awarded pursuant to the 'special- equity' common-benefit doctrine may, at times, be computed using the lodestar method where circumstances warrant." City of Birmingham v. Horn, 810 So. 2d 667, 681 (Ala. 2001) (citing Charles v. Goodyear Tire & Rubber Co., 976 F. Supp. 321 325 (1997)) (applying the lodestar method after noting the difficulty in valuing a settlement that included equitable relief); and Cooperstock v. Penwalt Corp., 820 F. Supp. 921, 926 (E.D. Pa. 1993) (applying the lodestar method after finding that the benefit conferred upon the class plaintiffs was "unquantifiable")).

"The first step in applying the lodestar formula is to determine the appropriate hourly rate. In determining the appropriate hourly rate, the court should first consider the attorney's usual billing rate." Cityside Archives Ltd. v. New York City Health & Hosps. Corp., 37 F. Supp. 2d 652, 658 (D.N.J. 1999) (citing Public Interest Research Group of N.J., Inc. v. Windall, 51 F.3d 1179, 1185 (3d Cir. 1985)). "The Supreme Court has indicated that the district court can also consider the 'prevailing market rates' in the relevant community to assist in the determination of an appropriate hourly rate." Id.; see Blum v. Stenson, 465 U.S. 886, 895 (1984). "In calculating the second part of the lodestar formula, the time reasonably expended, '[the district court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" Id.; see Public Interest, 51 F.3d at 1188. "Time expended is considered 'reasonable' if the work performed was 'useful and of a type ordinarily necessary to secure the final result obtained from the litigation.'" Id.

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier. 'The multiplier is a device that attempts to account for the contingent

32

nature or risk involved in a particular case and the quality of the attorneys' work.'" In re Diet Drugs, 582 F.3d at 540 n.33.  There is strong suggestion that " a multiplier of 3 [is] the ceiling for an award in a simple case where 'no risks pertaining to liability or collection were pertinent.'" Id. at 545 n.17 (citing In re Cendant Corp. Prides Litig., 243 F.3d 722 (3d Cir. 2001)).

Class Counsel indicates that the total amount of attorneys' fees accrued pursuant to the underlying litigation, before application of a lodestar multiplier, is approximately $1,606,466.25. Class Counsel reports that, "after deducting total expenses of $131,777.16, the fee requested is approximately 2.18 times Class Counsel's overall lodestar, representing an average hourly rate of approximately $1,294 per hour."  Individually, Carella, Byrne, Cecchi, Olstein, Brody & Agenllo, P.C. reports an expenditure of $12,133.46 in litigation costs and a presently uncompensated expenditure of 874.80 hours, cumulatively, totaling $570,027.50. The resulting non-weighted average hourly rate is approximately $651.60.  Individually, Grant & Eisenhofer, P.A. reports an expenditure of $93,493.28 in litigation costs and a presently uncompensated expenditure of 982.30 hours, cumulatively, totaling $457.438.00.  The resulting non-weighted average hourly rate is approximately $465.68.  Individually, Seeger Weiss LLP reports an expenditure of $21,363.29 in litigation costs and a presently uncompensated expenditure of 583.70 hours, cumulatively, totaling $384,335.50.  The resulting non-weighted average is approximately $658.44.  Individually, Pomerantz, Haudek, Grossman & Gross LLP reports an expenditure of $4,159.98 in litigation costs and an uncompensated expenditure of 142 hours, cumulatively, totaling $88,166.50.  The resulting non-weighted average is approximately $620.88.  Individually, Brower Piven, P.C. reports an expenditure of $681.15 in litigation costs and an uncompensated expenditure of 189.45 hours, cumulatively, totaling $106,498.75.  The resulting non-weighted average is approximately $562.14.  Therefore, the Court

concludes an overall hourly lodestar non-weighted average ranging from $465.68 to $681.15 is not unreasonable in light of similar rates charged in the market and in light of the usual billing rates documented in counsel's declarations to the Court.  Further, in reviewing the submissions detailing the time expended, the Court concludes that efforts by counsel were reasonable and were executed with an eye towards the final result achieved.

The fee arrangement was concluded pursuant to mediation before the Honorable Nicholas H. Politan, former U.S.D.J.  By way of declaration, Judge Politan asserts that the fee agreement "was the product of extensive arm's-length negotiations, hard fought litigation and excellent advocacy from all parties."  "[W]ith regard to attorneys' fees[,] . . . the presence of an arms' length negotiated agreement among the parties weighs strongly in favor of approval," even if it is "not binding on the court." Weber v. Gov. Emples. Ins. Co., 2009 U.S. Dist. LEXIS 91322, *53 (D.N.J. Sep. 30, 2009).  Judge Politan further states, "I believe it is in the interests of all the parties that they avoid the burdens and risks associated with further litigation."   Additionally, each firm involved in the present matter has submitted declarations containing itemized expenditures and charts detailing hourly rates of work performed by each partner, associate and support staff member.  Moreover, this fee is the product of mediation conducted before a disinterested and revered member of the legal community, therefore, the Court is hard pressed to conclude that the fee is not warranted.  Further, the application of a multiplier of 2.18 is not uncommon where the lodestar method is applied. See also In re Diet Drugs, 582 F.3d at 545 n.42.  Finally, in awarding these fees, the court is mindful of the fact that the fee award requested was a negotiated amount with the assistance of a neutral third party and further, that Defendants acknowledge and agree to this amount.  Accordingly, this Court concludes that the requested $3.5 million dollar attorney fee application is appropriate.

3.  <u>Costs</u>

The Court also finds that Class Counsel is entitled to receive costs, as they have been "adequately documented and reasonably and appropriately incurred in the prosecution of the case." <u>See</u> <u>In re Cendant Corp.</u>, 232 F. Supp. 2d at 343 (quoting <u>In re Safety Components Int'l, Inc.</u>, 166 F. Supp. 2d 72, 104 (D.N.J. 2001)).  Class Counsel has provided itemized expenditures, and has certified that full documentation of the costs have been maintained in the firms' records. Costs are to be awarded in the amount of $131,777.16.

**III.  CONCLUSION**

Upon review, this Court concludes that the Settlement is fair, adequate and reasonable.  For the foregoing reasons, Plaintiffs' motion for class certification is **granted**, for final approval of the Settlement is **granted** and for the award of attorneys' fees requested is **granted**.


         **S/ Dennis M. Cavanaugh**
         Dennis M. Cavanaugh, U.S.D.J.

Dated:       March  _25_, 2010
Original:   Clerk
cc:         All Counsel of Record
            Hon. Mark Falk, U.S.M.J.
            File